# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# ABINGDON DIVISION

| | |
|---|---|
| **FAYE W. SUDDARTH,** ) | |
| ) | |
| Plaintiff, ) | Case No. 1:12CV00029 |
| ) | |
| v. ) | **OPINION** |
| ) | |
| **CAROLYN W. COLVIN, ACTING** ) | By:  James P. Jones |
| **COMMISSIONER OF SOCIAL** ) | United States District Judge |
| **SECURITY,**[1] ) | |
| ) | |
| Defendant. ) | |

*Roger W. Rutherford, Wolfe, Williams, Rutherford & Reynolds, Norton, Virginia, for Plaintiff; Eric P. Kressman, Regional Chief Counsel, Region III, Roxanne Andrews, Assistant Regional Counsel, and Kenneth DiVito, Special Assistant United States Attorney, Office of the General Counsel, Social Security Administration, Philadelphia, Pennsylvania, for Defendant.*

In this social security case, I affirm the decision of the Commissioner.

I

Plaintiff Faye W. Suddarth filed this claim challenging the final decision of the Commissioner of Social Security (the "Commissioner") denying her claim for disability insurance benefits pursuant to Title II of the Social Security Act (the

---

[1] Carolyn W. Colvin became the Acting Commissioner on February 14, 2013, and is substituted for Michael J. Astrue as the defendant in this suit pursuant to Fed. R. Civil P. 25(d).

"Act"), 42 U.S.C.A. §§ 401-434 (West 2011 & Supp. 2013).  Jurisdiction of this court exists under 42 U.S.C.A. § 405(g).

Suddarth applied for disability benefits on October 17, 2007, alleging disability beginning on November 6, 2006.  Her date last insured was September 30, 2010.  Suddarth's claim was denied initially and upon reconsideration.  A hearing was held before an administrative law judge ("ALJ") on April 20, 2010, at which Suddarth, represented by counsel, and a vocational expert ("VE") testified.  On May 27, 2010, the ALJ issued a decision denying Suddarth's claim.  The Appeals Council denied her request for review, thereby making the ALJ's decision the final decision of the Commissioner.  Suddarth then filed the Complaint in this court seeking judicial review of the Commissioner's decision.

The parties have filed cross motions for summary judgment, which have been fully briefed, and the case is now ripe for decision.

II

Suddarth claims disability due to bipolar disorder and panic attacks.  She was 65 years old on the date of the ALJ's decision, making her a person of advanced age under the regulations.  20 C.F.R. § 404.1563(c) (2013).  She holds a bachelor's degree in education, and she previously worked as a stock clerk, sales attendant, cashier/checker, and home health aide to the elderly.

Suddarth visited Smyth Regional Internal Medicine in April 2006, complaining of irritability, inability to get along with others, and weight gain. (R. at 291.) She refused medications. (*Id.*) Visit notes from August 2006 indicate psychomotor agitation and tearfulness. (R. at 290.)

Suddarth sought treatment from the Mount Rogers Community Services Board ("Mount Rogers") on March 5, 2007. (R. at 255.) She was hypervigilant but cooperative, sad, irritable, and anxious, and displayed impaired judgment and poor insight. (*Id.*) She expressed that she was feeling overwhelmed and anxious, and she described passive suicidal thoughts. (*Id.*) Suddarth continued to refuse to take medication for bipolar disorder. (*Id.*) She reported staying at her daughter's house in Lynchburg, Virginia, to babysit during the week, and returning to her home two hours away on the weekends. (*Id.*) She was ambivalent about returning to work at Wal-Mart. (*Id.*)

Suddarth returned to Mount Rogers on May 15, 2007. (R. at 250.) She was again sad, irritable, and anxious, and she was experiencing intrusive thoughts, impaired judgment, poor insight, and sleep disturbance. (*Id.*) She sought this appointment the same day because she had been experiencing increased panic attacks and anxiety. (*Id.*) She reported being frustrated with her eye doctors regarding continuing problems with her vision and what she perceived as overcharges. (*Id.*) The counselor's notes indicated, "She doesn't take any

responsibility for her own behavior – she is refusing to pay some of her medical bills [because] she feels the [doctors] charged her too much money." (R. at 250.) Suddarth stated that although previously she had refused to take medication due to experiencing negative side effects in the past, she believed she may require medication for bipolar disorder. (*Id.*) The counselor encouraged her to find a doctor who would prescribe a mood stabilizer. (*Id.*) Counseling notes indicate that Suddarth felt "hopeless at times about not working – having too much time, too much debt." (R. at 252.) The counselor assessed no functional limitations that would affect Suddarth's ability to care for herself. (R. at 253.) Suddarth appeared for counseling only sporadically, and the counselor indicated that she was diagnosed with "a serious mental illness and needs continued counseling to prevent decompensation." (*Id.*) Nevertheless, the estimated length of service was stated as just six to nine months. (*Id.*)

Suddarth again visited Mount Rogers on July 23, 2007, stating that she had been experiencing increased negative thoughts, felt claustrophobic at times, and did not "like the way the light comes through the trees." (R. at 249.) She reported having more suicidal thoughts, but indicated that she would not actually commit suicide. (*Id.*) She reported that she was no longer babysitting her granddaughter and was feeling antsy. (*Id.*) Suddarth requested a referral to a psychiatrist with Mount Rogers, but the counselor informed her that she could not get a referral

unless she made a commitment to keep her appointments and take her medication as prescribed. (*Id.*) In the past, when other doctors had prescribed medications, she had only taken them for about a month. (*Id.*) Suddarth indicated that she would try to find a new primary care physician who would prescribe her bipolar medication. (*Id.*)

Suddarth returned to Smyth County Community Hospital on August 1, 2007 because she felt her bipolar disorder was "out of control." (R. at 288.) She was still resistant to taking medication. (*Id.*) The next day, Suddarth visited Mount Rogers again and reported that Dr. Squires from Smyth County Community Hospital had prescribed lithium. (R. at 247.) Counseling notes reveal that when Suddarth was at Dr. Squires's office, a fellow member of her church called Dr. Squires to report that Suddarth was suicidal. (*Id.*) Mount Rogers arranged for Suddarth to see a psychiatrist on August 7. (*Id.*) Suddarth reported that she was almost arrested for wanting to hurt her husband. (*Id.*) The counseling notes indicate, however, that Suddarth's judgment and insight were improved and that she recognized the need for medication. (*Id.*)

Two days later, Suddarth reported that the lithium was helping to control her racing thoughts. (R. at 248.) She indicated that she would attend a bipolar support group. (*Id.*) She was still experiencing passive suicidal thoughts and some paranoia and anger, but she seemed motivated to work on her illness, and the

counselor noted minimal progress.  (*Id.*)  On August 13, 2007, Suddarth was calmer and less irritable or angry, but complained that the lithium was causing her to feel empty and emotionless.  (R. at 246.)  The counselor again noted minimal progress.  (*Id.*)

On August 15, 2007, Suddarth reported that her mood swings were decreasing but she suffered from insomnia and lack of appetite.  (R. at 287.)  Dr. Squires recommended that she improve her diet and increase her physical activity level, and he increased her dosage of lithium.  (*Id.*)

Marylou Inocalla, M.D., a psychiatrist, evaluated Suddarth on August 22, 2007.  Suddarth stated that she felt displaced, suffered from ruminating thoughts, and was experiencing increased depression and suicidal ideation.  (R. at 304.)  She also reported having panic attacks and recounted an incident in which she physically attacked her husband, from whom she was separated.  (*Id.*)  She expressed anger and guilt.  (R. at 305.)  Suddarth indicated that she believed a proper dose of Zoloft, which she had taken in the past, would help her depression.  (*Id.*)  Dr. Inocalla described Suddarth as tearful and tense, with a constricted affect and dysphoric mood, but appropriately dressed with good hygiene and grooming.  (*Id.*)

When Suddarth visited Mount Rogers on August 30, 2007, she had an unkempt appearance and stated that she had no motivation or energy.  (R. at 245.)

She continued to babysit during the week. (*Id.*) She was depressed, and the counselor indicated that her condition was deteriorating. (*Id.*) Suddarth returned to Dr. Squires, who discontinued Zoloft and prescribed Celexa. (R. at 286) Suddarth indicated that she wanted to return to work at Wal-Mart. (*Id.*)

Suddarth was still feeling depressed and displaced in September 2007. (R. at 243.) By mid-October, however, Suddarth reported she was feeling better on her medication, and the counselor noted she smiled and had a brighter affect. (R. at 242.) The counselor felt Suddarth was making moderate progress. (*Id.*) That December, Suddarth continued to report feeling better on her medication. (R. at 241.) The counselor again noted minimal progress in January 2008. (R. at 240.) Suddarth reported she no longer had mood swings but was unable to get excited about things and had difficulty concentrating. (*Id.*) She felt she only needed to attend counseling monthly. (*Id.*)

Dr. Inocalla evaluated Suddarth again on February 13, 2008, and assigned a Global Assessment of Functioning ("GAF") score of 55.[2] (R. at 236.) Suddarth reported being very unhappy, worrying constantly, and having racing thoughts and

---

[2] A GAF score indicates an individual's overall level of functioning at the time of examination. It is made up of two components: symptom severity and social occupational functioning. A GAF score ranging from 61 to 70 indicates some mild symptoms or some difficulty in social, occupational, or school functioning; a GAF score ranging from 51 to 60 denotes functioning with moderate symptoms or moderate difficulty in social, occupational, or school functioning; a GAF score ranging from 41 to 50 indicates functioning with serious symptoms or any serious impairment in social, occupational, or school functioning. Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 32-34 (4th ed. 2000).

passive suicidal ideations. (*Id.*) She told Dr. Inocalla that she was still babysitting her grandchild and worried that when her grandchild no longer needed her, she would have no work to do, but she also felt that her depression and mood swings would preclude competitive employment. (*Id.*) Dr. Inocalla noted that Suddarth was appropriately dressed with good hygiene and grooming, maintained fair eye contact, was responsive and coherent, spoke at a normal rate and tone, was alert and oriented, had intact cognitive functioning, exhibited fair judgment and insight, and displayed a constricted affect and dysphoric mood. (*Id.*) Dr. Inocalla recommended increasing lithium and Celexa, continuing counseling, and increasing activities, socialization, exercise, and relaxation. (R. at 237.) She instructed Suddarth to return in three months and to call if her symptoms worsened. (*Id.*) On the same day, Suddarth also had a counseling appointment. The counselor's notes also reflect depression, poor judgment, passive suicidal thoughts, and anxiety. (R. at 239.) Suddarth indicated that she was considering babysitting another child in the area when her daughter no longer needed her to babysit. (*Id.*) The counselor noted an increase in Suddarth's symptoms. (*Id.*)

Christopher Carusi, Ph.D., a psychologist, evaluated Suddarth on February 18, 2008, at the request of the state agency. Dr. Carusi diagnosed Major Depressive Episode, Moderate and Bipolar Disorder, and he assigned a GAF score of 45. (R. at 311-12.) Among her activities of daily living, Dr. Carusi noted that

Suddarth did her own laundry, prepared her own meals, and did errands outside the home as needed. (R. at 310.) Suddarth stated that she had been a good employee until she developed eye problems, at which time she had taken medical leave followed by personal leave. (*Id.*) A mental status examination revealed that Suddarth was oriented, spoke clearly and logically, had an intact long-term and working memory, had no problems with word fluency, and could follow both simple and multi-step directions, but there was some evidence of impulsivity. (R. at 311.) Dr. Carusi gave the following functional assessment:

> Ms. Suddarth's comprehension appeared adequate during this evaluation. It is likely that she is capable of understanding direction, including simple and more detailed and complex directions. It is likely that Ms. Suddarth's reported symptoms interfere with her ability to maintain consistent attendance and may hamper her ability to handle normal work stressors at times.

(R. at 312.)

On June 24, 2008, Suddarth again visited Mount Rogers and reported feeling bored and restless because she was no longer babysitting her granddaughter, but she indicated that she planned to start babysitting twins that August. (R. at 233.) Suddarth continued to feel that life was not worthwhile, but she had no thoughts or plans of self-harm. (*Id.*) Suddarth stated that her mood had been more stable and she had experienced less depression thanks to her medications, though she had suffered a recent manic episode. (*Id.*) The counselor completed an annual Clinical Assessment Update form in which she assessed mild limitation in social skills but

no other functional limitations. (R. at 229.) The counselor assigned Suddarth a GAF score of 55. (R. at 230.) The record also contains handwritten notes from Dr. Inocalla on the same date, but the notes are largely illegible. (R. at 234.)

At the end of July 2008, Suddarth reported that she was feeling okay but had some regrets about her sexual activities. (R. at 227.) She felt slightly manic, but not as manic or irritable as she had felt before beginning a medication regimen. (*Id.*) Suddarth admitted to continued passive suicidal thoughts but stated that she had lived with these kinds of thoughts for years. (*Id.*) The counselor again noted minimal progress. (*Id.*) By late August, however, Suddarth reported feeling good, and the counselor noted moderate progress. (R. at 226.) In September 2008, Suddarth appeared in a pleasant mood, smiled and laughed, and stated that she was enjoying babysitting eleven-month-old twins. (R. at 225.) Because of Suddarth's improvement, the counselor recommended reducing the frequency of her appointments to every six weeks. (*Id.*) The counselor again noted moderate progress. (*Id.*) Suddarth continued to improve and was doing quite well in November 2008. (R. at 224.) She continued to babysit and visit her daughters, and she felt her medications had really helped her. (*Id.*) The counselor noted that Suddarth had "made much progress over past year" and further reduced the frequency of counseling sessions to once every two to three months. (*Id.*)

Dr. Inocalla again evaluated Suddarth on February 9, 2009, and February 13, 2009, but the notes from these appointments are also largely illegible. (R. at 222, 217.) On February 16, Suddarth returned to Mount Rogers and was fearful about not being in counseling in the future. (R. at 221.) She stated that she tries to find purpose in her life through babysitting, and that helping an older man on the weekends made her feel better. (*Id.*) The counselor noted no change in Suddarth's progress. (*Id.*) By June 2009, Suddarth reported being more depressed, and the counselor noted an increase in symptoms. (R. at 218.) The counselor informed Suddarth that she would be leaving Mount Rogers and that Suddarth would be transferred from individual counseling sessions in to a recovery group. (*Id.*)

On October 14, 2009, Dr. Inocalla completed a Mental Residual Functional Capacity Questionnaire. She diagnosed bipolar disorder and panic disorder, and she assessed Suddarth's GAF score at 58, with the highest GAF in the past year being 55. (R. at 353.) Dr. Inocalla noted some improvement but indicated that Suddarth was chronically depressed, had low energy and motivation, suicidal ideation off and on, and a dysphoric mood. (*Id.*) Dr. Inocalla completed a check-the-box chart of Mental Abilities and Aptitudes Needed to Do Unskilled Work and found that Suddarth was either unable to meet competitive standards or had no useful ability to function in nearly every category. (R. at 355.) Dr. Inocalla opined

that Suddarth would miss more than four days per month due to her impairments or treatment. (R. at 357.)

Two psychologists, Joseph I. Leizer, Ph.D., and Howard S. Leizer, Ph.D., reviewed Suddarth's file at the request of the state agency in February and July 2008, respectively. Dr. J. Leizer opined that Suddarth was moderately limited in her ability to maintain attention and concentration for extended periods and to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances. (R. at 313.) He further opined that Suddarth was moderately limited in her ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; to interact appropriately with the general public; to accept instructions and respond appropriately to criticism from supervisors; to get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and to maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness. (R. at 314.) He noted no marked limitations. (R. at 313-14.) Dr. J. Leizer found a number of discrepancies between Suddarth's subjective self-reports and the observations of her examiners and treatment professionals. (R. at 315.) He noted her extensive activities of daily living and found that Suddarth's disability allegations were not fully credible. (*Id.*) He concluded that she was afflicted with

the medically determinable impairments of bipolar syndrome and anxiety disorder, but that these conditions did not restrict her activities of daily living and only moderately restricted her ability to maintain social functioning or to maintain concentration, persistence, or pace. (R. at 319, 321, 326.) Dr. H. Leizer concurred with the assessment of Dr. J. Leizer. (R. at 333-48.)

      The ALJ found that Suddarth suffers from the severe impairments of bipolar disorder without psychotic features and panic disorder without agoraphobia, but that she had no condition that met or equaled a listed impairment. The ALJ found that Suddarth's mental impairments would render her unable to understand, remember, or carry out complex job instructions, but that she would be fully capable of carrying out both detailed and simple, non-complex tasks and working with supervisors, coworkers, and the general public. The ALJ discussed Suddarth's unwillingness to take medication and her extensive activities of daily living, including full-time babysitting and regular traveling, as well as her marked improvement once she did begin to take medication. The ALJ also noted several references in the record to Suddarth's restlessness and desire to return to work, along with the numerous discrepancies between Suddarth's reported symptoms and the objective medical evidence. Finding that Dr. Inocalla's opined limitations were supported by little or no objective evidence, the ALJ determined that Dr. Inocalla's assessments were not fully credible and gave them little weight. The ALJ

concluded that Suddarth was capable of performing her past relevant work as a stock clerk, sales attendant, cashier/checker, and home health aide to the elderly, and thus was not disabled under the Act.

Following the ALJ's decision, Suddarth submitted to the Appeals Council another Medical Assessment of Ability to Do Work-Related Activities (Mental) completed by Dr. Inocalla on March 15, 2011. On this form, Dr. Inocalla opined that Suddarth had fair or poor to no ability to perform all of the stated activities. (R. at 365-66.) Dr. Inocalla noted Suddarth's difficulty focusing, concentrating, and comprehending; her anxiety and manic-depression; and her difficulty in public places. (*Id.*) The Appeals Council incorporated this assessment into the record.

Suddarth contests the Commissioner's decision, arguing that it is unsupported by substantial evidence because the ALJ gave insufficient weight to Dr. Inocalla's opinions and did not adopt certain limitations found in the opinions of Dr. Carusi and the state agency psychologists. The Commissioner argues that the ALJ properly evaluated the evidence of record and substantial evidence supports the ALJ's assessment of Suddarth's residual functional capacity ("RFC").

III

The plaintiff bears the burden of proving that she is under a disability. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972). The standard for disability is strict. The plaintiff must show that her "physical or mental impairment or impairments are of such severity that [s]he is not only unable to do h[er] previous work but cannot, considering h[er] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ." 42 U.S.C.A. §§ 423(d)(2)(A).

In assessing disability claims, the Commissioner applies a five-step sequential evaluation process. The Commissioner considers whether the claimant: (1) has worked during the alleged period of disability; (2) has a severe impairment; (3) has a condition that meets or medically equals the severity of a listed impairment; (4) could return to her past relevant work; and (5) if not, whether she could perform other work present in the national economy. *See* 20 C.F.R. §§ 404.1520(a)(4) (2013). The fourth and fifth steps of the inquiry require an assessment of the claimant's RFC, which is then compared with the physical and mental demands of the claimant's past relevant work and of other work present in the national economy. *Id.*; *Johnson v. Barnhart*, 434 F.3d 650, 653-54 (4th Cir. 2005).

I must review the denial of benefits under the Act to ensure that the ALJ's findings of fact "are supported by substantial evidence and [that] the correct law was applied." *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401 (1971) (internal quotation marks and citation omitted). I must not reweigh the evidence or make credibility determinations because those functions are left to the ALJ. *Johnson*, 434 F.3d at 653. "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [ALJ]." *Id*. (alteration in original) (internal quotation marks and citation omitted).

An ALJ is required to weigh medical opinions based on: "(1) whether the physician has examined the applicant, (2) the treatment relationship between the physician and the applicant, (3) the supportability of the physician's opinion, (4) the consistency of the opinion with the record, and (5) whether the physician is a specialist." *Id.* at 654. While "[c]ourts often accord greater weight to the testimony of a treating physician," *id.* (internal quotation marks and citation omitted), the ALJ is not required to do so "if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence." *Craig v. Chater*, 76 F.3d 585, 590 (4th Cir. 1996). If the ALJ does not give the treating

physician's opinion controlling weight, the ALJ must "give good reasons in [the] notice of determination or decision for the weight [he or she] give[s] [the] treating source's opinion." 20 C.F.R. §§ 404.1527(c)(2) (2013).

I find that the objective evidence of record sufficiently supports the Commissioner's decision. Suddarth openly admitted, repeatedly, to babysitting full-time throughout much of her alleged period of disability. At no point in the record did she ever indicate that her mental impairments interfered with her reliability or ability to perform that task. Moreover, she mentioned at several points that she stopped working at Wal-Mart not due to her long-existing mental impairments, but due to eye surgeries, and that prior to her surgeries, she was a good employee despite her impairments. Suddarth herself noted significant improvement of her symptoms once she began taking medication, and her counselor also felt that Suddarth had made great improvement through the course of her treatment. Indeed, both Suddarth and her counselor elected to reduce the frequency of counseling sessions, and Dr. Inocalla only saw Suddarth every three months for medication management. The record contains statements by both Suddarth and her treating professionals indicating that Suddarth's mental ailments may actually be alleviated somewhat by increased activity and working. The ALJ thoroughly reviewed all the evidence and explained in detail the reasons for his decision. Dr. Inocalla's extreme opinion, which essentially concluded that

Suddarth was capable of performing next to no work activities, is contradicted by the record evidence, and the ALJ did not err in discrediting it. Similarly, the ALJ gave some weight to the other opinion evidence to the extent those opinions were supported by the objective evidence in the record. The ALJ acted within his discretion by declining to give weight to portions of the psychologists' opinions that were unsupported by the other evidence.

The Appeals Council, and this court, must consider new and material evidence submitted after the ALJ's decision that is relevant to the period on or before the date of the ALJ's decision. 20 C.F.R. § 404.970(b) (2013); *see Wilkins v. Sec'y, Dep't of Health & Human Servs.*, 953 F.2d 93, 96 (4th Cir. 1991) (holding that where Appeals Council considered additional evidence and incorporates it into the record, the reviewing court must also consider the new evidence as part of the record). This means that I must review the ALJ's decision in light of evidence that the ALJ never considered, *see Ridings v. Apfel*, 76 F. Supp. 2d 707, 709 (W.D. Va. 1999), while also refraining from making factual determinations, *McGinnis v. Astrue*, 709 F. Supp. 2d 468, 471 (W.D. Va. 2010). Therefore, my review of the new evidence is limited to determining whether it "is contradictory, presents material competing testimony, or calls into doubt any decision grounded in the prior medical reports." *Davis v. Barnhart*, 392 F. Supp. 2d 747, 751 (W.D. Va. 2005) (internal quotation marks and citations omitted). If

the new evidence creates a conflict, then a remand is warranted so that the Commissioner can weigh and resolve the conflicting evidence. *Id.*

I find that the new evidence submitted after the ALJ's decision — Dr. Inocalla's March 2011 assessment — is cumulative of other evidence in the record and does not create a conflict. Therefore, no remand is warranted.

IV

For the foregoing reasons, I find that the Commissioner's decision is supported by substantial evidence. The plaintiff's Motion for Summary Judgment will be denied, and the defendant's Motion for Summary Judgment will be granted. A final judgment will be entered affirming the Commissioner's final decision denying benefits.

DATED: September 16, 2013

/s/ James P. Jones
United States District Judge